AO 91 (Rev. 11/82)                          **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | DOCKET NO. |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JASON SHIAO, aka "Jason Zheng,"<br>aka "Zheng Yi Xiao,"<br>LYNN LEUNG, aka "Linda," and<br>SHANNON MENDOZA | **15-1668M** |
| | MAGISTRATE'S CASE NO. |

FILED
CLERK, U.S. DISTRICT COURT

SEP - 8 2015

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

Complaint for violation of 18 U.S.C. §§ 371, 1546(a), and 2(b) (Conspiracy to Commit Visa Fraud and Causing an Act to be Done)

| NAME OF MAGISTRATE JUDGE | | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION |
|---|---|---|---|
| HONORABLE SUZANNE H. SEGAL | | | Los Angeles, California |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| Date Unknown to at least<br>September 8, 2015 | Los Angeles County | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. §§ 371, 1546(a), 2(b) ]

Beginning on a date unknown to the Grand Jury and continuing to on or about September 8, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants JASON SHIAO, also known as ("aka") "Jason Zheng," aka "Zheng Yi Xiao," LYNN LEUNG, aka "Linda," and SHANNON MENDOZA and others known and unknown to the Grand Jury, conspired, combined, and agreed with each other to commit the following offenses against the United States: to knowingly forge, alter, falsely make, use, possess, obtain, accept, and receive, and willfully cause to be forged, altered, falsely made, used, possessed, obtained, accepted, and received, a document prescribed by statute and regulation for entry into and as evidence of authorized stay and employment in the United States, that is, Forms I-130 filed by United States citizens on behalf of their foreign national spouses, knowing them to be forged, altered, and falsely made, to have been procured by means of a false claim and statement, and to have been otherwise procured by fraud and unlawfully obtained, all in violation of Title 18, United States Code, Sections 371, 1546(a) and 2(b).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**DANIEL P. CARNEY**          /S/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Department of Homeland Security, Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>*Suzanne H. Segal* | DATE<br>September 8, 2015 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Sheila Nagaraj x2690          REC: Detention

# A F F I D A V I T

1.    I, Daniel P. Carney, being duly sworn, hereby state as follows:

## I.   INTRODUCTION

a.    I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since June 2010.  Previously, I was employed with the Department of Homeland Security ("DHS"), as a Border Patrol Agent from July 2006-June 2010.  Through such employment, I have received formal training in the investigation and prosecution of cases involving immigration and visa fraud.  I am currently assigned to the Document and Benefit Fraud unit in Los Angeles, California.  This unit conducts both immigration and criminal investigations relating to benefits fraud, including asylum fraud, the sale of counterfeit identification documents, and marriage fraud, which concerns aliens entering into marriages with United States citizens solely to obtain permanent resident status (often referred to as a "green card").

b.    During my career as a law enforcement agent, I have participated in many criminal investigations either as a case agent or in a subsidiary role.  I have debriefed numerous defendants, informants, and witnesses who had personal knowledge regarding criminal organizations.  Additionally, I have participated in many aspects of criminal investigations including undercover operations, surveillance, and search warrants.

Instrumentality Protocol - Filter Team

c.    I make this affidavit based upon my personal knowledge and experience, my review of pertinent documentation, discussions with other investigating law enforcement agents, interviews with witnesses, and in particular:

d.    My review of written reports about this investigation that were prepared by myself or other investigating law enforcement agents;

e.    The interviews of witnesses indicated herein;

f.    My review and examination of documents obtained from interviewed witnesses, or through other methods described herein;

g.    Physical surveillance conducted by law enforcement agents, including myself; and

h.    My discussions with other investigating law enforcement agents and immigration personnel.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of the issuance of arrest warrants and criminal complaints against JASON SHIAO ("SHIAO"), also known as ("aka") "Jason Zheng," aka "Zheng Yi Xiao", LYNN LEUNG ("LEUNG"), aka "Linda", and SHANNON MENDOZA ("MENDOZA") for a violation of Title 18, United States Code, Section 371 (Conspiracy to Commit Visa Fraud, in violation of Title 18, United States Code Section 1546(a)), and 18 United States Code, Section 2(b) (Causing an Act to be Done).  This affidavit is also made in support of an application for a search warrant of Jason (USA) International Law Corporation, aka Zhengyi & Associates, a business located at 80 South Lake

Instrumentality Protocol - Filter Team

Avenue, Suite 555, Pasadena, California 91101 (the "SUBJECT PREMISES"), described in Attachment A, for the items to be seized described in Attachment B.   Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. <u>PREMISES TO BE SEARCHED</u>

4.    The SUBJECT PREMISES are described as follows and in Attachment A:

a.    The premises to be searched is Jason (USA) International Law Corporation, also known as Zhengyi & Associates, a business located at 80 South Lake Avenue, Suite 555, Pasadena, California 91101 ("SUBJECT PREMISES").   The SUBJECT PREMISES is believed to be operated by Jason SHIAO and his daughter, Lynn LEUNG.   The SUBJECT PREMISES is located in a multiple-story, gray colored commercial building on the southeast corner of the intersections of East Green Street and South Lake Avenue in Pasadena, California.   There is a glass door entrance to the building on the south side of Lake Avenue,

3
Instrumentality Protocol - Filter Team

east of the entrance to a Wells Fargo Bank, which is also located at 80 South Lake Avenue.  The SUBJECT PREMISES is located within Suite 555, which is on the fifth floor.  Upon exiting the elevator bank on the fifth floor, and facing east, there is an east-west hallway ("East-West Hallway") where Suite 555 is located.  Suite 555 is the third door on the right when heading east from the elevator.  A brown wooden door serves as the entrance to Suite 555.  A golden metallic sign to the left of the door reads "555" in black letters.  Underneath the sign reading "555" is another sign which reads "Zhengyi & Associates."  Across from the entrance to the SUBJECT PREMISES is a doorway which leads to a stairwell.

## IV. ITEMS TO BE SEIZED

5.    The items to be seized constitute the evidence, fruits, and instrumentalities of violations of Title 8, United States Code, Section 1325(c) (Marriage Fraud); Title 18, United States Code, Section 1546(a) (Fraud and Misuse of Visas, Permits and other Documents), and Title 18, United States Code, Section 371 (Conspiracy to Commit Offense or Defraud the United States). The items to be seized are further described in Attachment B, which is incorporated herein by reference.

## V. SUMMARY OF PROBABLE CAUSE

6.    HSI is investigating SHIAO, LEUNG and MENDOZA for various criminal offenses relating to their arranging of fraudulent marriages between United States citizens and foreign nationals.  By way of background, foreign nationals are able to obtain legal immigration status in the United States if they

4

Instrumentality Protocol - Filter Team

submit petitions for visas based on a marriage to a United States citizen. The investigation has revealed that LEUNG and SHIAO are arranging fraudulent marriages between foreign nationals and United States citizens, in exchange for a substantial fee paid by the foreign nationals to attempt to obtain legal immigration status in the United States. In the course of this scheme, LEUNG and SHIAO promise to pay United States citizens varying amounts, typically no more than $10,000, to enter into fraudulent marriages with foreign nationals. The foreign nationals, in turn, pay LEUNG and SHIAO a much larger amount for the opportunity to marry a United States citizen in order to obtain legal immigration status. One Chinese foreign national beneficiary admitted to agreeing to pay SHIAO $50,000 for her immigration application. LEUNG and SHIAO arrange the marriages, coach the couples on how to make the marriages appear legitimate, file the immigration petitions with United States Citizenship and Immigration Services ("USCIS"), and create fraudulent documentation — such as apartment leases, bank statements and income tax returns — to make the marriages appear as if the United States citizen and foreign national have a legitimate life together. The foreign nationals typically hear about SHIAO and LEUNG's scheme through a friend or newspaper advertisements. The United States citizens are referred by a friend who has already been in a fraudulent marriage, or through a recruiter.

7.   MENDOZA, working at the direction of SHIAO and LEUNG, recruits United States citizens to act as petitioners for the

Instrumentality Protocol - Filter Team

fraudulent marriages.  MENDOZA introduces the idea of a
fraudulent marriage as a means of earning money to potential
United States citizen candidates, who are usually in dire
economic straits, and arranges meetings for them with SHIAO and
LEUNG.  During the course of this investigation, at least three
United States citizen petitioners identified MENDOZA as the
individual who recruited them into the fraudulent marriages with
foreign nationals arranged by SHIAO and LEUNG.  Three additional
United States citizen petitioners identified MENDOZA as a
recruiter working on behalf of SHIAO and LEUNG.

## VI. STATEMENT OF PROBABLE CAUSE

### A.   BACKGROUND ON OBTAINING LAWFUL PERMANENT RESIDENT STATUS THROUGH MARRIAGE

8.   Based upon my training and experience, my
conversations with witnesses, law enforcement agents who
investigate immigration fraud, and other immigration officials,
I have learned the following:

a.   An alien can obtain lawful permanent resident
status, and ultimately United States citizenship, based on a
legitimate marriage to a United States citizen.  A marriage
entered into fraudulently to obtain an immigration benefit is a
violation of 8 U.S.C. § 1325(c), among other statutes.  If an
alien marries a United States citizen, the United States citizen
can file a "Petition for Alien Relative," commonly referred to
as a Form I-130 ("I-130") to obtain lawful status for his/her
alien spouse.  Such a petition would be filed with USCIS.

6

b.    Prior to March 1, 2003, such a petition was filed with the Immigration and Naturalization Service ("INS"), United States Department of Justice.  Once an I-130 is filed, the alien relative is allowed to remain in the United States until a decision is made on the petition.  Usually, the alien simultaneously files a Form I-485, Application to Register Permanent Residence or Adjust Status.  Once the legitimacy of a marriage has been established, the I-130 is approved. Frequently, a USCIS adjudicator, or interviewer, will conduct an interview with the married couple, who are each placed under oath, in order to ascertain the legitimacy of the marriage ("marriage interview").

c.    The alien's I-485 application is then reviewed to determine the alien's eligibility to become a lawful permanent resident.  If the alien appears eligible and has been married longer than two years, his/her I-485 is approved and s/he is granted resident status.  This lawful status allows him or her to remain and work in the United States.  If the alien has been married to the United States citizen for less than two years, s/he is granted conditional lawful permanent resident status.

d.    After a period of two years, the United States citizen can file an application to remove the condition from the alien relative's permanent resident status (Form I-751).  If approved, the alien becomes a lawful permanent resident.  After having maintained lawful permanent status as a spouse of a United States citizen for three years, the alien can apply for United States citizenship via Form N-400, Application for

Naturalization.  In order to naturalize, the alien must show, among other things, that s/he was lawfully admitted as a permanent resident and that s/he has been a person of good moral character.  An applicant for naturalization is precluded from establishing good moral character if s/he has given false testimony under oath for the purpose of obtaining an immigration benefit.

e.    If the alien is outside of the United States and wants to enter the United States based on being engaged to marry a United States citizen, the United States citizen can file an I-129F, Petition for Alien Fiancé/Fiancée.  If the petition is approved, the alien may come to the United States and obtain permanent status through the I-130 and I-485 petitions as described above.

f.    Along with submitting immigration petitions, the United States citizen and foreign national usually submit documentation to establish that they have a bona fide marriage and an established life together.  This can be done through the submission of joint apartment leases, joint bank account records, joint insurance documents, marriage certificate, employment documents, and more.  After such documents are submitted to USCIS, they will eventually be lodged into the foreign national's A-file.

B.    **COMMENCEMENT OF THE INVESTIGATION**

9.    In September 2012, the DHS Tip Line received information regarding alleged marriage fraud from an anonymous caller.  The caller identified two Chinese lawyers as the

8

brokers of fraudulent marriages between United States citizens and Chinese nationals, operating in the Los Angeles area. The two attorneys were identified as "Jason Last Name Unknown ("LNU")" and "Linda LNU," later identified as SHIAO and LEUNG. The caller stated that the attorneys would receive $80,000 per marriage and the United States citizens would receive $15,000 for agreeing to marry the foreign national. The caller identified three specific individuals as three United States citizens whom SHIAO and LEUNG had paid to marry foreign nationals. In subsequent interviews I conducted, each of those three individuals admitted to participating in a fraudulent marriage that had been orchestrated by SHIAO and LEUNG.

10. As part of my investigation, I have interviewed a total of twenty-three United States citizens who admitted to being part of a marriage fraud scheme organized by LEUNG and/or SHIAO. Investigation revealed that SHIAO and LEUNG pay the United States citizens to marry a foreign national without the intention of establishing a life together, charge the foreign national for arranging the marriage, arrange the wedding ceremony, file the immigration applications, prepare the couple for the marriage interview with USCIS, file fraudulent documents which create the appearance of a life together, and offer additional money to the United States citizens if they refer other United States citizens who are willing to get married in exchange for money.

11. I have also identified more than 70 suspected fraudulent immigration applications that appear to have been

9

Instrumentality Protocol - Filter Team

filed as part of the scheme.  The date range for these 70
applications is October 2006 through July 2015.  More than 60 of
these applications or documents submitted in support of the
application use at least one of 19 addresses in common, with all
of those addresses involving properties or mailboxes rented or
owned by LEUNG, SHIAO, or two of their co-conspirators, Employee
Number One and Employee Number Two.  As part of their duties as
employees, Employee Numbers One and Two list their names on
various lease agreements as co-tenants with SHIAO.  Since the
addresses used on the immigration petitions are controlled by
SHIAO, LEUNG, and their co-conspirators, they can effectively
control the immigration application of the foreign national
client.  SHIAO and LEUNG receive all correspondence from USCIS
regarding the immigration application.  SHIAO and LEUNG receive
notifications of interviews with USCIS, notifications of
approval or denial of immigration applications, and green cards
sent to the foreign nationals.  Therefore, the foreign nationals
are dependent upon SHIAO and LEUNG to further their immigration
applications, and are likely to continue paying them as a
result.  Based on my training and experience, I know that
brokers of fraudulent marriages will often continue to collect
money from foreign nationals even if the application has been
denied by telling the foreign national that the petition is
still pending.

     12.  As mentioned above, more than 60 of the fraudulent
applications identified as part of this investigation use at
least one of nineteen addresses controlled directly or

10

indirectly by SHIAO and LEUNG.  In an effort to portray the appearance that the fraudulent marriage couples are actually living together at one of the 19 addresses, there is frequently a residential lease submitted with the immigration application indicating that the couple lived together at the listed address. Alien file ("A-file") reviews and subpoenaed rental agreements revealed that SHIAO, LEUNG, and Employee Numbers One and Two, were the actual tenants or renters of the nineteen addresses. For some of the fraudulently married couples, residential lease agreements were submitted to USCIS with the applications showing that the couples lived at addresses that were actually rental mailboxes.

13.  One of the addresses that is being used as part of the marriage fraud scheme in the fashion described above, as well as a principal place of operation of the conspiracy, is the SUBJECT PREMISES.  A plaque on the outside of the door was previously labeled "Jason (USA) International Law Corp," and is currently labeled "Zhengyi & Associates."

a.  According to the website for the California Secretary of State, the business entity known as "Jason USA International Law Corporation" is registered to entity number C3361773, is located at the SUBJECT PREMISES, and lists Huizhi Zhang as the agent for service of process.  The status of the business is currently described as "FTB (Franchise Tax Board) Suspended."

b.  On August 27, 2015, I conducted a search of the Internet, Facebook, and Twitter for "Jason (USA) International

Instrumentality Protocol - Filter Team

Law Corporation," as well as "Zhengyi & Associates."  My
Internet search yielded no results for a business website
corresponding to either "Jason (USA) International Law
Corporation" or "Zhengyi & Associates."  My Facebook and Twitter
searches yielded no positive results.

14.   Interviews of the United States citizens who admitted
that they were in fraudulent marriages arranged by LEUNG and/or
SHIAO revealed that SHIAO often holds himself out to be an
attorney.  SHIAO also distributes business cards which indicate
he is an attorney.  However, according to the website for the
California State Bar (http://www.calbar.ca.gov, last visited
August 25, 2015), SHIAO is not listed as a licensed attorney in
California, under either his true name or any of his aliases.
On August 25, 2015, I conducted a query of the Martindale
Hubbell attorney database, and confirmed that SHIAO is not
listed as an attorney in the United States or Canada, under
either his true name or any of his aliases.

15.   SHIAO's own A-file contains a Form N-400 which lists
his employment as a manager of Jason International Law
Corporation.  The lease for the SUBJECT PREMISES lists the
tenant as "Jason USA International Law Corporation."  The lease
is signed by JASON SHIAO and LYNN LEUNG under the "tenants"
section.  Employee Number One is listed on the lease as the
"guarantor."

16.   The investigation has also revealed that LEUNG told at
least one United States citizen participating in the marriage
fraud scheme to inform USCIS that the United States citizen

worked for Universal Talent Media Group, a company whose listed address is the SUBJECT PREMISES. The Form I-130 filed by the citizen on behalf of her alien husband lists Universal Talent Media Group as the citizen's employer. In addition, at least one other petition that the investigation has identified as related to SHIAO and LEUNG lists Universal Talent Media Group as an employer of the petitioner. In my training and experience, individuals involved in marriage fraud schemes such as the one that LEUNG and SHIAO are operating will list companies created by the marriage brokers, such as themselves, as their employers so that the brokers can falsely represent to immigration officials that the individuals petitioning for immigration status work for them.

a. According to the website for the California Secretary of State, the business entity known as Universal Talent Media Group is registered as entity number C3569866, is located at the SUBJECT PREMISES, and lists LEUNG as the agent for service of process.

17. During the course of my investigation, I identified numerous fraudulent marriages and, with the assistance of other investigative agents, was able to uncover details regarding the nature of SHIAO and LEUNG'S visa fraud and marriage fraud scheme. The fraudulent marriages described in Section VI.C-G, below, are meant to be a representative sample of SHIAO and LEUNG's scheme and do not represent the entirety of the scheme.

Instrumentality Protocol - Filter Team

### C.  Fraudulent Marriage of United States Citizen Number One ("USC-1") and Foreign National Number One ("FN-1")

18.  DHS maintains A-file AXXXXX8847 for FN-1, a Chinese foreign national.  I reviewed the file for FN-1 and it contained an I-130 petition filed by USC-1 on behalf of FN-1.  On August 28, 2013, I interviewed USC-1 and she provided the following information:

a.  In approximately February or March 2012, USC-1 was approached by a friend, Unindicted Co-Conspirator Number One.  Unindicted Co-Conspirator Number One said that he knew someone who was doing marriage fraud and could help USC-1 with her bills.

b.  In approximately April 2012, Unindicted Co-Conspirator Number One took USC-1 to an office in Alhambra, California, where she met a man named "Jason," whom USC-1 later identified as SHIAO.  USC-1 believed that SHIAO was a lawyer because the plaque on the office said so.  SHIAO took a photograph of USC-1 and said that Unindicted Co-Conspirator Number One would contact her if she was a good candidate for a fraudulent marriage.

c.  Approximately two weeks later, Unindicted Co-Conspirator Number One told USC-1 to meet at SHIAO's office.  At the office, Unindicted Co-Conspirator Number One met with SHIAO alone.  Unindicted Co-Conspirator Number One then met with USC-1 and told her that she would get married in two days.  USC-1 was not given a specific amount that she would earn for the marriage, but was told that it would be less than $5,000.  Two

Instrumentality Protocol - Filter Team

days later, USC-1 went to a store in Temple City and met FN-1 for the first time.  SHIAO and Unindicted Co-Conspirator Number One were also at the store.  On May 19, 2012, SHIAO and LEUNG caused FN-1 and USC-1 to be married.  Afterward, SHIAO gave USC-1 an envelope with $1,000 in cash.

        d.    Approximately two months later, USC-1 went to the SUBJECT PREMISES to try and get FN-1's phone number.  Unindicted Co-Conspirator Number One had previously told USC-1 that she was not allowed to have FN-1's number.  At the office, SHIAO told USC-1 that she was not to talk to FN-1.  SHIAO stated that any dealings with FN-1 would have to go through SHIAO.  SHIAO said that if USC-1 needed money to come to him.  USC-1 stated that she needed money and SHIAO said that he could not give her money until her meeting with immigration was completed.  During this visit to SHIAO's office, USC-1 met SHIAO's secretary, whom USC-1 later identified as LEUNG.

        e.    In October 2012, LEUNG called USC-1 and said that she (USC-1) needed to go to Las Vegas, Nevada, in two days to meet FN-1 for their honeymoon at the Wynn Hotel for one night.  LEUNG told USC-1 that she would be paid for going.  Two days later, LEUNG called USC-1 and told her that she would earn $500 for going to Las Vegas.  LEUNG stated that SHIAO was not going to go to Las Vegas, but that she could drive USC-1 to Las Vegas.

        f.    USC-1 drove to Las Vegas with a friend.  In Las Vegas, USC-1, LEUNG, and FN-1 went out to dinner and took pictures.  LEUNG gave USC-1 $350 and a hotel room key for the Wynn.  USC-1 stayed in a room with her friend.  The next

15

morning, USC-1, FN-1, LEUNG, and a friend of LEUNG had breakfast together.  LEUNG and her friend stepped away from the table and FN-1 and USC-1 exchanged phone numbers.

g.    On a later date, Unindicted Co-Conspirator Number One called USC-1 and said USC-1 needed to meet FN-1 at a hotel in Monrovia to prepare for the upcoming marriage interview with USCIS.  USC-1 was told that she could stay at the hotel, but declined.  USC-1 met FN-1 and LEUNG at a hotel.  LEUNG instructed USC-1 to memorize information about FN-1 including his job, birthday and other personal information.  LEUNG told them to say that they initially met at a bar in Pasadena.  The next day, USC-1 and FN-1 met again for an hour to practice with LEUNG for the marriage interview.

h.    The day of the marriage interview, FN-1 picked up USC-1 from her house and drove her to USCIS's office. Afterward, they went to SHIAO's office and SHIAO gave USC-1 $2,000 cash in an envelope.

i.    USC-1 tried calling FN-1 to get more money subsequent to the marriage interview, but FN-1 did not take her calls.  USC-1 called SHIAO to try and get a hold of FN-1, but SHIAO said that USC-1 is done and there would be no more dealings with FN-1.

j.    USC-1 stated that she never lived with FN-1 nor consummated the marriage.

k.    USC-1 provided me with the business card that SHIAO had given her.  The card lists the name "Jason SHIAO". The card indicates that SHIAO is a lawyer and a justice of the

peace.  The card further indicates that SHIAO is a Managing
Partner for Jason (USA) International Law Corporation.

19.  Based on my review of FN-1's A-file, I learned that on
or about September 9, 2013, SHIAO and LEUNG caused an I-130 for
FN-1 to be filed with USCIS, with the purpose of obtaining
conditional lawful permanent resident status for FN-1, based on
the fraudulent marriage between USC-1 and FN-1.

   **D.   Fraudulent Marriage of United States Citizen Number
        Two ("USC-2") and Foreign National Number Two ("FN-2")**

20.  DHS maintains A-file AXXXXX2781 for FN-2, a Chinese
foreign national.  I reviewed the file for FN-2 and it contained
an I-130 petition filed by USC-2 on behalf of FN-2.  On March
18, 2014, I interviewed USC-2 and USC-2 provided the following
information:

   a.   In June 2012, USC-2 was dating Unindicted Co-
Conspirator Number Two.  Unindicted Co-Conspirator Number Two
told USC-2 that he could earn money by marrying a foreigner who
was trying to obtain citizenship.  Unindicted Co-Conspirator
Number Two said that the marriage would need to last between two
and two and a half years.

   b.   In February 2013, LEUNG called USC-2 and said
that she works for a law firm in Pasadena, California that
specializes in immigration and naturalization.  USC-2 had been
referred to LEUNG by Unindicted Co-Conspirator Number Two.

   c.   In June 2013, LEUNG called USC-2 and said that
she found a wife for him and directed him to come to her office
located at the intersection of Lake and Green in Pasadena.  That

17

same day, USC-2 went to the office and met SHIAO, LEUNG, FN-2, and FN-2's husband. SHIAO identified himself as a lawyer of Jason (USA) International Law. LEUNG introduced FN-2's husband to USC-2 as FN-2's brother, and used her fingers to create air quotations while saying "brother". SHIAO later admitted that the man was actually FN-2's husband. SHIAO said that he wanted FN-2 and USC-2 to marry and that LEUNG would make the arrangements. SHIAO said that USC-2 would be paid monthly and at every "event."

d. Approximately one week later, LEUNG spoke with USC-2 on the phone. LEUNG stated that USC-2 would earn $2,000 for the marriage, $200 per month until the marriage interview, $2,000 at the interview, and an additional lump sum at the end.

e. At some point, SHIAO told USC-2 that he would earn $18,000 total for the marriage. LEUNG and SHIAO told USC-2 he could earn an additional $1,000 if he referred another United States citizen for a fraudulent marriage.

f. On July 13, 2013, USC-2 married FN-2 at Dynasty Wedding Studio, located in Temple City, California. In attendance was, LEUNG, SHIAO, United States Citizen Number Three ("USC-3") (at the time, USC-3 was the boyfriend of USC-2), FN-2, and FN-2's husband. FN-2 and USC-2 posed for pictures at the wedding and at a nearby park. SHIAO paid USC-2 $2,000 in an envelope at the wedding studio. Both LEUNG and SHIAO directed USC-2 to not contact FN-2.

g. In October 2013, LEUNG called USC-2 and told him to come to the office. At the office, LEUNG gave USC-2 $200 for

Instrumentality Protocol - Filter Team

his scheduled monthly payment, and an additional $200 for USC-2 to purchase a new phone.  LEUNG told USC-2 he would have a "honeymoon" in Las Vegas with all expenses paid.  Approximately two weeks later, USC-3 and USC-2 drove to Las Vegas, Nevada.  In Las Vegas, USC-3 and USC-2 met LEUNG and a man named "Kenny," ("Unindicted Co-Conspirator Number Three") believed to be the assistant of LEUNG.  Unindicted Co-Conspirator Number Three gave USC-2 a room key for USC-2 and USC-3.  All the meals and hotel costs were paid for by LEUNG.  LEUNG gave USC-2 and USC-3 $500 each as additional disposable income.  LEUNG claimed that the money was from FN-2.  FN-2 and her husband were also in Las Vegas.  FN-2 and USC-2 posed for pictures designed to make them look like legitimate spouses.

          h.   In November 2013 (about a week before the marriage interview), USC-2 stayed at a hotel in Pasadena per LEUNG's instructions so that he could prepare for the immigration interview.  USC-3 stayed with USC-2.  USC-2 met with FN-2, LEUNG, and Kenny to prepare.  They discussed FN-2's and USC-2's backgrounds.  USC-2 was instructed to memorize the address where he was supposed to live with FN-2.  The address was 22 W. Green Street, #401, Pasadena, California (the address used on the I-485 and I-130 petitions).  USC-2 went to this address once with FN-2 and took pictures there.  USC-2 does not know who actually lives there.  USC-2 was instructed to memorize FN-2's social security number and FN-2's family members' names.

          i.   On the day of the marriage interview, LEUNG and Kenny picked up USC-2 and took him to the interview.  While in

Instrumentality Protocol - Filter Team

the waiting room for the interview, a Chinese-language interpreter arrived. During the interview, LEUNG and Unindicted Co-Conspirator Number Three waited in the lobby. At some point during the interview, FN-2 and USC-2 were interviewed separately. USC-2 admitted to the USCIS adjudicator that he was gay after the interviewer asked to see his phone. The USCIS adjudicator asked the interpreter to leave. The interpreter refused at first but then complied after several requests.

        j.   USC-2 never lived with FN-2 nor consummated the marriage.

21.   Based on my review of FN-2's A-file, I learned that on or about September 9, 2013, SHIAO and LEUNG caused a Form I-130 for FN-2 to be filed with USCIS, with the purpose of obtaining conditional lawful permanent resident status for FN-2, based on the fraudulent marriage between FN-2 and USC-2.

### E.   FRAUDULENT MARRIAGE OF USC-3 AND FOREIGN NATIONAL NUMBER THREE ("FN-3") AND SUBSEQUENT UNDERCOVER OPERATION

22.   One of the suspected fraudulent marriages that I have identified is one in which a Form I-130 was filed by USC-3 on behalf of FN-3, a Chinese foreign national. On March 26, 2014, USC-3 and FN-3 were scheduled to be interviewed by USCIS as part of USC-3's application for legal immigration status for FN-3. Along with other HSI agents, I conducted surveillance of this interview. Immediately before the interview, we observed USC-3 and FN-3 in front of the federal building at 300 N. Los Angeles Street, Los Angeles, California, the location of their USCIS marriage interview ("Federal Building"). We observed USC-3 and

Instrumentality Protocol - Filter Team

FN-3 meet with LEUNG and an interpreter outside the building.
USC-3, FN-3, LEUNG, and the interpreter stood together in the
security line outside the Federal Building.  When the group
advanced to the front of the line, LEUNG split from the group
and allowed USC-3, FN-3 and the interpreter to enter the
building without her.  As LEUNG departed, the other three went
to the 8th floor of the building for the interview.

23.  After beginning the interview process, but before the
interview was completed, USC-3 left the building for a cigarette
break.  I, along with HSI Special Agent Jennifer Reyes,
approached USC-3 when he was outside the building during this
break and I identified myself and Special Agent Reyes as HSI
agents.  During the interview, USC-3 told us the following:

a.    USC-3 was in a fraudulent marriage with FN-3,
as arranged by LEUNG and SHIAO.  According to USC-3, LEUNG and
SHIAO paid him to marry FN-3 in order for FN-3 to obtain legal
immigration status in the United States.  USC-3 stated that he
was supposed to be paid $2,000 for completing the marriage
interview.

24.  USC-3 also said that LEUNG booked a trip for him to go
to New Zealand to "pose as a husband to be."  USC-3 initially
stated that he did not know what it means to "pose as a husband
to be," but later clarified that he agreed to do it for the
money that LEUNG offered to him.  USC-3 indicated that LEUNG was
going to pay him $1,000 for the trip and pay for his
transportation costs.  USC-3 also later stated that his
understanding of the New Zealand trip involved him taking

21

pictures with a woman he did not know in order to make it look like they were attending a marriage ceremony.

25.  Based on my training and experience, individuals engaged in marriage fraud schemes such as the one that LEUNG and SHIAO are operating will frequently send United States citizens on recruiting trips to foreign countries in order for the United States citizens to meet with foreign nationals who are potential spouses.  The United States citizens will pose as husbands or wives for the foreign nationals and offer to marry them in exchange for a fee, all as organized by the brokers of the fraudulent marriages.  In my training and experience, the brokers of fraudulent marriages will use these recruiting trips to try to recruit new customers into the scheme, as the scheme requires an ever expanding number of new customers for the brokers to continue to make money.  The brokers will also use the recruiting trips to have the United States citizens pose for photographs with foreign nationals to try to make the relationships appear legitimate before immigration applications are filed.

26.  Following our conversation on the street outside the federal building on March 26, 2014, USC-3 agreed to cooperate with HSI agents in the investigation.  I gave USC-3 an audio recording device to conduct consensually monitored recordings with LEUNG and SHIAO, and USC-3 then returned to the marriage interview with FN-3 and the interpreter.  The following is based on the surveillance observations of myself and other HSI agents

Instrumentality Protocol - Filter Team

who were participating in the investigation, as well as a review of the consensually monitored recording:

a. After the marriage interview, USC-3 met with FN-3 and LEUNG at the Hilton Hotel in Pasadena, California. HSI agents conducted surveillance of this meeting. I participated in part of this surveillance, but most of the information that I have about the meeting comes from other HSI agents. The meeting took place in the lobby of the Hilton Hotel. LEUNG and USC-3 sat next to each other during this meeting. Following a brief conversation, LEUNG placed an envelope on the table in front of USC-3. USC-3 received the envelope and, after further conversation, USC-3 took the envelope and walked to the bathroom. HSI agents met USC-3 in the bathroom, and while there, he handed them the envelope that LEUNG had given to him. HSI agents opened the envelope and found that it contained $3,000 cash and two e-mail printouts. The first e-mail was addressed to LEUNG at innlynn@hotmail.com. This e-mail provided hotel reservation information for USC-3's trip to New Zealand. The second e-mail was to a different e-mail address, and it contained USC-3's flight itinerary to New Zealand.

27. I presented USC-3 with a six-pack photographic line-up containing a photograph of SHIAO. USC-3 immediately recognized and identified SHIAO as one of the individuals who arranged the fraudulent marriage. I then presented USC-3 with a six-pack photographic line-up containing a photograph of LEUNG. USC-3 immediately recognized and identified LEUNG as the individual who had made the flight and hotel arrangements to New Zealand

for him, as well as the individual he met with at the Hilton Hotel to receive payment for the fraudulent marriage.

28. On April 4, 2014, HSI Special Agent Darwin Tchan and I interviewed FN-3. Based on my interview, I learned the following:

    a. FN-3 admitted meeting USC-3 through a law office in Pasadena. FN-3 saw an advertisement for the law firm in the Chinese Daily News. The advertisement said that the law firm could help with different kinds of immigration issues. FN-3 identified the law firm as Jason International.

    b. FN-3 scheduled an appointment with the law firm and met at the SUBJECT PREMISES with a man whom she thought was an attorney, and was later identified as SHIAO. The man identified himself as Jason Zheng. At the SUBJECT PREMISES, FN-3 told SHIAO that she wanted to immigrate to the United States. SHIAO told her that the easiest way is to have a United States citizen husband. At the SUBJECT PREMISES, FN-3 signed a contract agreeing to pay $50,000 in exchange for having a husband introduced to her and to get her green card.

    c. FN-3 showed HSI agents this contract; a handwritten note from the law firm agreeing to return any money paid by FN-3 if her immigration application is not successful, and three receipts for money paid by FN-3 to Jason (USA) International Law Corporation. I reviewed each of these documents and noted the following:

        i. The contract's letterhead reads "Jason (USA) International Law Corp., 80 S. Lake Ave. Suite 555, Pasadena, CA

Instrumentality Protocol - Filter Team

91101. Tel: (626) 568 8038 Fax: (626) 568 8039." The title of
the contract is "Power of Attorney Agreement." The contract
lists various charges FN-3 would have to pay that totaled
$50,000. The third page of the contract is signed "Jason Zhen"
and dated October 7, 2013.

        d.   On or about October 13, 2013, LEUNG and SHIAO
arranged for FN-3 to marry USC-3. FN-3 originally thought that
LEUNG and SHIAO were going to broker a legitimate marriage for
her, but later found out that the relationship was not real and
that USC-3 is, in fact, gay. During one conversation, LEUNG
told FN-3 that the marriage was "a business deal" and that FN-3
could not contact USC-3.

        e.   In or around December 2013, FN-3 met LEUNG at the
SUBJECT PREMISES and signed a blank form. Agents showed FN-3
the I-485 petition submitted to USCIS bearing FN-3's signature.
The petition is a six-page document that contained FN-3's
signature on the sixth page. FN-3 identified the sixth page of
the document as the form that she signed at the SUBJECT
PREMISES. When FN-3 signed the petition, LEUNG did not show her
the first five pages of the petition.

    29.   Between October 2013 and March 2014, FN-3 paid SHIAO
and LEUNG a total of $40,000.

    **F.**   **FRAUDULENT MARRIAGE OF UNITED STATES CITIZEN NUMBER
        FOUR ("USC-4") AND FOREIGN NATIONAL NUMBER FOUR ("FN-
        4") AND SUBSEQUENT UNDERCOVER OPERATION**

    30.   Another one of the suspected fraudulent marriages that
I have identified in my investigation is based on a Form I-130
filed by USC-4 on behalf of FN-4, a Chinese foreign national.

On May 20, 2014, USC-4 and FN-4 were scheduled to be interviewed by USCIS as part of USC-4's filing of a Form I-130 in order to obtain legal immigration status for FN-4. Along with other HSI agents and Diplomatic Security Services ("DSS") Agent Luis Orozco, I conducted surveillance of the location leading up to the scheduled interview. Immediately before the interview, we observed FN-4 and another woman, identified as the Chinese-language interpreter, in the lobby of the Federal Building at 300 N. Los Angeles Street in Los Angeles. We further observed LEUNG outside in front of the Federal Building with an unknown Asian female. USC-4 then arrived in front of the building, spoke with LEUNG, and then entered the building alone, joining the Chinese-language interpreter and FN-4. The interpreter, FN-4, and USC-4 went to the 8th floor of the building for the interview.

31.  After the interview concluded, FN-4 and USC-4 left the Federal Building and went to the parking garage across the street. USC-4 got into a car with an unidentified man. FN-4 left the garage alone. HSI Special Agents Mark Buenaluz and Scott Keszler, as well as DSS Special Agent Luis Orozco, approached USC-4, who was accompanied by an unidentified man, inside of the parking garage and identified themselves as special agents. I then questioned USC-4 about the legitimacy of her marriage to FN-4. USC-4 admitted that her marriage to FN-4 was fraudulent and stated that LEUNG and SHIAO fraudulently arranged the marriage in exchange for payment. USC-4 stated that she had previously been recruited by MENDOZA to marry a

Instrumentality Protocol - Filter Team

foreign national in exchange for money.  MENDOZA told USC-4 that
everything USC-4 would be doing was legal, but USC-4 later
realized that was not true when she saw the immigration
application with fraudulent information.  USC-4 stated that
LEUNG and SHIAO paid her to marry FN-4.  USC-4 said that she was
told she would be paid $2,000 for going to this immigration
interview.

     32.  Following our conversation inside the garage on May
20, 2014, USC-4 agreed to cooperate with HSI agents in the
investigation.  I gave USC-4 an audio recording device to
conduct consensually monitored recordings with LEUNG and SHIAO.
USC-4 then went to the SUBJECT PREMISES, where she was told she
would receive the $2,000 for attending the immigration
interview.

     33.  Agents conducted surveillance as USC-4 parked near the
SUBJECT PREMISES, and USC-4 entered the SUBJECT PREMISES alone.
After being inside the SUBJECT PREMISES for approximately 20
minutes, USC-4 exited the building along with LEUNG and the
unknown Asian female previously seen with LEUNG at the Federal
Building.  USC-4 was escorted by LEUNG and the other Asian
female to the car.  USC-4 and the unidentified man left together
in the vehicle and met with agents parked several blocks away.

     34.  USC-4 stated that while she was inside the SUBJECT
PREMISES, LEUNG paid her $2,000 in cash.  USC-4 said that LEUNG
instructed her to sign a receipt for the money.  LEUNG told USC-
4 that USC-4 would be contacted for another payment once LEUNG
confirmed that USC-4 and FN-4 passed the marriage interview.

Instrumentality Protocol - Filter Team

35.   I presented USC-4 with a six-pack photographic line-up containing a picture of LEUNG.   USC-4 immediately recognized and identified LEUNG as the woman working at the SUBJECT PREMISES who had arranged the fraudulent marriage between USC-4 and FN-4.

   G.   **FRAUDULENT MARRIAGE BETWEEN UNITED STATES CITIZEN NUMBER FIVE ("USC-5") AND FOREIGN NATIONAL NUMBER FIVE ("FN-5")**

36.   Another one of the suspected fraudulent marriages that I have identified is a Form I-130 filed by USC-5 on behalf of FN-5, a Chinese foreign national.   On May 28, 2014, USC-5 and FN-5 were scheduled to be interviewed by USCIS as part of USC-5's filing of a Form I-130 in order to obtain legal immigration status for FN-5.   Along with other HSI agents, I conducted surveillance of the location prior to the scheduled interview. The following is based on my own surveillance observations, conversations with witnesses and other agents, and review of reports:

   a.   Immediately before the interview, we observed USC-5 and FN-5 meet with a Chinese-language interpreter in the lobby of the Federal Building on Los Angeles Street.   The three went to the 6th floor for the interview.

   b.   After beginning the interview process but before the interview was completed, USC-5 left the USCIS office on the 6th floor and took the elevator to the 3rd floor.   I, along with HSI Special Agents Scott Keszler and Aaron O'Dell, approached USC-5 as she was walking through the hallway and identified myself and Special Agents Keszler and O'Dell as law enforcement agents.   We questioned USC-5 about the legitimacy of her

28
Instrumentality Protocol - Filter Team

marriage to FN-5.  USC-5 admitted that her marriage to FN-5 was fraudulent and stated that LEUNG arranged the marriage in exchange for payment.  USC-5 stated that LEUNG paid her to marry FN-5 in order for FN-5 to obtain legal immigration status in the United States.  USC-5 said that she was supposed to be paid $2,000 for going to this immigration interview.

      c.   USC-5 said that in November 2013, she was approached by a man named Shannon MENDOZA.  MENDOZA told USC-5 that he knows an attorney who performs fraudulent marriages. MENDOZA said that USC-5 would have to marry an immigrant who was trying to remain in the United States.  MENDOZA said that USC-5 would have to stay married for two years.  MENDOZA said that USC-5 would be paid $2,000 on the day of marriage and $400 per month until she is interviewed by immigration.  MENDOZA said that USC-5 would be paid $4,000 or $5,000 after the interview.

      d.   Approximately three weeks after MENDOZA initially approached USC-5, MENDOZA took USC-5 to an office at the intersection of Lake and Green in Pasadena, California.  The suite number was 555.  Based on USC-5's description of the location, I believe it is the SUBJECT PREMISES.  At the office, USC-5 met a woman named Linda, later identified as LEUNG.  Linda made copies of USC-5's social security card and identification card, and told USC-5 to fill out an application.  On or about December 10, 2013, USC-5 married FN-5 at a bridal shop.  This was the first time that USC-5 had ever met FN-5.  FN-5 and USC-5 posed for pictures at the wedding and posed for more pictures at

Instrumentality Protocol - Filter Team

a park.  Afterwards, an assistant of Linda paid USC-5 $2,000
cash.

e.   Following our conversation inside the Federal
Building on May 28, 2014, USC-5 agreed to cooperate with HSI
agents in the investigation.  I gave USC-5 an audio recording
device to conduct consensually monitored recordings with LEUNG
and SHIAO, and USC-5 then returned to the USCIS office, where
FN-5 and the Chinese-language interpreter were waiting.

f.   After the marriage interview, FN-5 drove USC-5 to
the SUBJECT PREMISES, where they both met with LEUNG.  LEUNG
gave USC-5 $1,600.  LEUNG explained that USC-5 was paid $1,600
instead of $2,000 because "Shannon" (later identified as
MENDOZA) had already collected some of the payment and was
supposed to give it to USC-5.  After leaving LEUNG's office,
USC-5 met with law enforcement agents several blocks away and
turned over $1,500 that she received from LEUNG as payment for
her involvement in the fraudulent marriage.  USC-5 explained
that she already gave her boyfriend $100 who had driven her from
the SUBJECT PREMISES to the meet with Agents.  USC-5 also turned
over to Agents several documents which had been given to her by
LEUNG before the USCIS interview.  LEUNG had told USC-5 to
memorize information from the documents.  Included in the
documents were copies of fake income tax returns for USC-5 and
I-130 and I-864 applications for FN-5 that listed USC-5's name
on the forms.

H.  ATTEMPTED FRAUDULENT MARRIAGE AND UNDERCOVER OPERATION
WITH A CONFIDENTIAL INFORMANT ("THE CI"[1])

37.  During the course of the investigation, I learned that
SHIAO was placing advertisements as an immigration service
provider in a Chinese-language, Los Angeles-based newspaper
known as "The World Journal."  In August 2014, I noticed that
The World Journal's website contained an advertisement for a
company advertising immigration services.  The advertisement
lists the company's address as the SUBJECT PREMISES, with a
contact phone number of (626) 833-8381.  Based on my knowledge
of the investigation, specifically conversations with witnesses
whom I had previously interviewed, I knew that this number had
been linked to SHIAO.

38.  On August 18, 2014, acting at my direction, the CI
called (626) 833-8381 and spoke with a man who identified
himself as Zheng, later identified as SHIAO.  SHIAO scheduled an
appointment to meet with the CI on August 19, 2014.

39.  On August 19, 2014, along with other HSI Agents, I
conducted surveillance of the SUBJECT PREMISES immediately prior
to the scheduled meeting between the CI and SHIAO.  The meeting
was audio and video-recorded through the use of a hidden

---

[1] The CI has one prior felony conviction, sustained on or
about September 15, 2011, for Possession for Sale of a
Counterfeit Mark, in violation of California Penal Code Section
350(a)(2), for which he received a sentence of five years'
probation and one day in county jail.  The CI has worked as an
informant for HSI since July 2012 and has participated in
approximately three investigations since then.  To the best of
my knowledge, the CI has provided truthful information that has
been independently corroborated.  I am not aware of any
instances where the information provided or statements made by
the CI to law enforcement personnel were not truthful.

Instrumentality Protocol - Filter Team

recording device placed on the CI.  The following is based on my
surveillance observations, my independent review of the video
recording, and my debriefing of the confidential informant
subsequent to the meeting.

      a.    During the meeting, SHIAO explained that the CI
could obtain immigration status through marriage to a United
States citizen.  SHIAO stated, "And we can, we can arrange a
U.S. uh, citizen spouse for you."  SHIAO stated that it would
cost the CI $5,000 to retain SHIAO as a lawyer; $10,000 for the
marriage; $5,000 after a receipt has been received showing that
his immigration application has been received; $5,000 when the
CI receives his work permit; $5,000 when the CI is interviewed
by immigration; $5,000 after the CI has passed the marriage
interview; $5,000 when the CI gets his permanent green card;
$2,315 for government fees; $500 to the photo studio on the day
of marriage; $300 for the pastor; and $300 for the registrar,
resulting in a total fee of approximately $43,415.

      b.    The CI asked if the girl would be Chinese.  SHIAO
explained that the CI could not afford a Chinese girl.  SHIAO
stated to not worry about not being able to speak English
because the CI would be allowed to bring an interpreter to the
interview with immigration.

      c.    The CI asked what would happen if immigration
investigates.  SHIAO stated that immigration has never
investigated any of his cases.  SHIAO stated "[t]he evidence
prepared by our attorney is very good."  The CI asked SHIAO if
he has to live with his spouse.  SHIAO stated, "You don't need

to. We are against it. Even if you want to live together, we won't even let you." SHIAO said that the lawyers must be present when the CI communicates with his spouse. SHIAO stated, "you are not allowed to... let's say, to have private contacts." SHIAO explained that the spouse may try to get the CI to buy things for her and the amount of money the CI has to spend is already agreed upon. SHIAO explained that the CI could not pay the spouse directly because it would be illegal.

   d. The CI asked what he should do after he gets his green card and no longer needed the spouse. SHIAO stated, "Get a divorce! Over here at my place..." SHIAO stated that SHIAO could get the CI a divorce in an hour.

   e. Before the meeting ended, SHIAO provided the CI with a business card. The business card contained the following information: "Jason USA International Law Corp., Jason Y Zheng, Attorney and Senior Partner, 80 S. Lake Ave., Suite 555, Pasadena, CA."

40. On August 26, 2014, acting at my direction, the CI called SHIAO. The CI made an appointment to meet SHIAO and provide the initial payment of $5,000 to sign a contract with SHIAO to start the immigration process. The CI and SHIAO agreed to meet on September 2, 2014.

41. On September 2, 2014, along with other HSI Agents, I conducted surveillance of the meeting between the CI and SHIAO at the SUBJECT PREMISES. The meeting was recorded in audio and video. The following is based on my surveillance observations,

my independent review of the video recording, and my debriefing
of the confidential informant subsequent to the meeting.

      a.   During the meeting, the CI explained that he did
not have any photo identification.  SHIAO asked the CI
biographical information for the immigration application.  The
CI signed a contract agreeing to pay a series of payments in
exchange for SHIAO acting as the broker for the fraudulent
marriage.  SHIAO provided the CI with a copy of the contract and
a receipt for the $5,000 paid to SHIAO.  SHIAO stated in regards
to meeting the spouse, "If you're compatible, then we can get
you married on Saturday."  After the CI paid SHIAO, SHIAO stated
"the person is already here" and that the CI could see her
shortly.

      b.   The CI again asked about when he can get a
divorce.  SHIAO replied, "After getting the green card...if you
get it today, then you can get divorced tomorrow right over here
at my place."  When the CI asked SHIAO if he had to live with
the spouse, SHIAO explained, "It's not worth it.  We only treat
it as a business and that's how we run it."

      c.   The CI told SHIAO that he did not have any
identification documents.  SHIAO stated that he could help the
CI obtain documents.  SHIAO explained that the CI needed to
bring him four passport photos.  SHIAO stated the documents
could be done within several days.  SHIAO urged the CI to get
the photos and more money soon so that the CI could get married
right away.  SHIAO stated, "This is the only way to guarantee
that you can get married on Saturday morning."

Instrumentality Protocol - Filter Team

d.    While the CI and SHIAO were waiting for the spouse to arrive at the SUBJECT PREMISES, SHIAO asked if the CI had any questions.  The CI expressed concern that the spouse would not cooperate.  SHIAO explained that the girl will cooperate because she wants money.  SHIAO stated, "Since they're here for money, we're not going to give the person all of the money in a lump sum."

e.    As SHIAO and the CI were talking, someone knocked on the door and an unidentified male and unidentified white female entered the office.  SHIAO introduced the unidentified white female and the CI to each other.  SHIAO asked the CI if he was okay with the way that the female looked.  SHIAO said that he was planning the wedding for Saturday.  SHIAO stated, "Husband and wife, have a hug," and laughed.  The CI said "nice to meet you," and left shortly after.

42.   On September 4, 2014, HSI Special Agent Wally Tsui and I interviewed the CI.  The CI said that SHIAO called him on September 3, 2014 (a Wednesday) and wanted the CI to get married that Saturday.  The CI explained to SHIAO that he did not have the money necessary yet and that he would be going to San Francisco to work.  At my direction, the CI then called SHIAO and scheduled to meet with SHIAO on September 8, 2014 to provide SHIAO with the passport photos for the passport.

43.   On September 8, 2014, HSI Agents conducted surveillance of the meeting between the CI and SHIAO at the Hilton Hotel at 225 W. Valley Boulevard in San Gabriel, California.  The meeting was recorded in audio and video.  The

Instrumentality Protocol - Filter Team

following is based on other agents' surveillance observations, my independent review of the video recording, and other agents' debriefing of the CI subsequent to the meeting.

a. During the meeting, the CI said that he was concerned that SHIAO was charging too much money. SHIAO said that "it's not a lot." SHIAO told the CI to think about it, but first "we have to make a passport for you," so that the CI can get married. The CI asked if the passport SHIAO was going to get for him would be fake or real. SHIAO stated, "The one I'm making for you, of course it's fake." The CI provided SHIAO with four passport photos. SHIAO further explained regarding the CI's birth certificate: "And also how about your notarial birth certificate... No one is going to make it for you so we have to make it for you." SHIAO goes on to say, "You tell me, how big is the risk going to be? Add up all these documents, it definitely exceeds 5,000 US dollars."

44. The CI asked SHIAO if the age difference between him and his spouse will be a problem. SHIAO stated that Americans don't care about the age difference. SHIAO stated, "an eighty-eight-year-old marrying a twenty-year-old is normal."

45. A review of the video recordings of the CI entering the SUBJECT PREMISES reveals at least two computers inside the SUBJECT PREMISES. Both times that the CI met with SHIAO, SHIAO was seated in front of a computer. During the meeting on September 2, 2014 at the SUBJECT PREMISES, SHIAO printed out the contract that the CI signed to obtain SHIAO's services using a

computer at his desk.  Another computer was clearly visible at the receptionist's desk.

### I.   SUBMISSION OF FALSIFIED LIFE INSURANCE POLICIES TO USCIS IN SUPPORT OF FRAUDULENT MARRIAGES

46.  On September 2, 2015, I reviewed a report from New York Life Insurance Company that analyzed the account numbers on approximately ten purported New York Life Insurance policies that had been submitted to USCIS and identified as being linked to SHIAO and LEUNG's scheme.  The analysis showed that the purported joint accounts between petitioners and beneficiaries were not authentic.  In some of the cases, the account numbers on the documents submitted to USCIS did not exist on any account with New York Life Insurance.  In the remaining cases, where the policy number was an authentic New York Life Insurance Company policy number, the authentic policy holder's names were different than the names shown on the policies submitted to USCIS.

### J.   IMMIGRATION FILINGS LISTING THE SUBJECT PREMISES AS HOME ADDRESSES

47.  Of the more than 70 suspected fraudulent immigration applications associated with SHIAO and LEUNG, at least seven additional foreign nationals' A-files, other than the aforementioned foreign nationals, list the SUBJECT PREMISES address as a home address on a document filed with USCIS.  The relevant fraudulent forms include, but are not limited to, marriage certificates; Forms I-693 (Report of Medical Examination); Form I-130 (Petition for Alien Relative), and Form I-485 (Application to Register Permanent Residence).

K.   RECENT IMMIGRATION FILINGS LINKED TO SHIAO, LEUNG AND
     THE SUBJECT PREMISES

48.   Of the more than 70 fraudulent immigration
applications associated with SHIAO and LEUNG, at least two were
filed during the last six months, as described below:

    a.   On or about July 11, 2015, USCIS received a Form
AR-11 (Alien Change of Address) filed on behalf Foreign National
Number Six ("FN-6"), which listed FN-6's new address as 168 West
Spring Street, Apt. 213, Pasadena, California ("168 West Spring
Street").  I obtained the authentic lease for this address, and
LEUNG was listed as the tenant for this address.  On the lease,
which was dated June 16, 2015, LEUNG listed her employer as
Universal Talent Media Group.  On or about August 25, 2015, I
conducted a Business Search on the website for the California
Secretary of State, which provides information on business
entities located in California, and found that Universal Talent
Media Group was registered to the SUBJECT PREMISES.

    b.   On August 25, 2015, HSI Special Agent Jennifer
Reyes conducted surveillance at 168 West Spring Street, and
observed a white BMW X5, bearing California license plate number
7XXX048, parked in an underground garage of the location,
specifically in parking spot number 156.  I conducted a query of
that license plate number in California Department of Motor
Vehicle ("DMV") records, and learned that the vehicle was
registered to LYNN LEUNG.

    c.   On or about July 10, 2015, USCIS received a Form
I-751 (Petition to Remove Conditions on Residence), filed on

behalf of Foreign National Number Seven ("FN-7"), which listed
FN-7's home address as 12537 Heritage Springs Drive, Santa Fe
Springs, California ("12537 Heritage Springs Drive").  On May 7,
2015, I conducted physical surveillance of 12537 Heritage
Springs Drive, and observed SHIAO enter and exit the garage of
that location, while seated as a passenger in a four-door
Mercedes sedan.  The vehicle bore California license plate
number 7XXX084, and a California DMV records query confirmed
that the vehicle was registered to SHIAO and Employee Number
One.

     d.    On or about August 25, 2015, HSI Special Agent
Scott Keszler conducted additional surveillance of this
location, and observed the same Mercedes sedan depart the
garage.  Special Agent Keszler could not identify the
occupant(s) of the Mercedes sedan.

     e.    On September 1, 2015, I spoke with El Segundo
Police Department Task Force Officer ("TFO") Chris Amorino, who
obtained the grant deed for 12537 Heritage Springs Drive from
Los Angeles County Recorder's Office.  TFO Amorino stated that
the grant deed listed SHIAO, Employee Number One and Wei Cui as
the owners of 12537 Heritage Springs Drive.

## VII. OCCUPANCY OF SUBJECT PREMISES

    49.  On March 5, 2015, I spoke with Greg Woolway
("Woolway") of IDS Real Estate Group, who is the property
manager of the SUBJECT PREMISES.  The sign in front of the
office building that contains the SUBJECT PREMISES and the
directory in the building's lobby previously specified "Jason

Instrumentality Protocol - Filter Team

(USA) International Law Corporation" as the occupants of the SUBJECT PREMISES.  In January 2015, I observed that the sign corresponding to the SUBJECT PREMISES had been changed, and now identified "Zhengyi & Associates" as the occupant.

50.  Woolway stated that Zhengyi & Associates is the same tenant previously known as Jason (USA) International Law Corporation.  Woolway stated that the tenants had requested and were granted permission to change the name on the sign and on the directory.  Woolway stated that Zhengyi and Associates have leased the SUBJECT PREMISES through September 2015.

51.  On July 30, 2015, while conducting physical surveillance of the SUBJECT PREMISES, I observed SHIAO exit the SUBJECT PREMISES on foot.

52.  On August 24, 2015, HSI Special Agent Sam Ahn conducted physical surveillance at the SUBJECT PREMISES, and observed SHIAO open the door of the SUBJECT PREMISES and look into the hallway.

## VIII.   SUBJECT PREMISES IS PERMEATED WITH FRAUD

53.  Based on my training and experience, as well as the training and experience of the other law enforcement agents with whom I have spoken about this investigation, I have concluded -- and believe that there is probable cause to establish -- that the business activities of Jason (USA) International Law Corporation are permeated with fraud and that all documents, records, and other items to be seized, as detailed in Attachment B, at the SUBJECT PREMISES, as detailed in Attachment A, constitute evidence, fruits, or instrumentalities of the

offenses described above. Specifically, during the course of the three-year investigation, which included my review of more than 80 A-files associated with beneficiaries participating in fraudulent marriages orchestrated by SHIAO and his employees, and interviews with approximately 35 witnesses, I did not find any evidence of the operation of a legitimate business at the SUBJECT PREMISES. To the extent that there are any non-fraudulent records located at the SUBJECT PREMISES, which is unclear, I do not believe that such records are segregable from evidence of Jason (USA) International Law Corporation's fraudulent activity.

54. In addition to my training and experience and the training and experience of the other law enforcement agents with whom I have spoken about this investigation, I base my aforementioned conclusions in paragraph 53 on the information detailed in this affidavit, including but not limited to, the fact that: (1) as discussed above, the review of immigration applications submitted to USCIS which have been affirmatively linked to Jason (USA) International Law Corporation; (2) interviews of more than twenty United States citizen petitioners who admitted to marrying foreign nationals in exchange for money, as arranged by SHIAO and LEUNG; (3) the undercover investigation recording discussions between LEUNG and petitioners of fraudulent marriages used to facilitate the filing of fraudulent immigration applications on behalf of foreign nationals; (4) interviews with foreign nationals who admitted that their marriages were arranged by SHIAO and/or

Instrumentality Protocol - Filter Team

LEUNG, and that their marriages were not legitimate; and (5) recorded conversations between SHIAO and the CI, wherein SHIAO attempted to arrange a fraudulent marriage for the CI to a United States citizen, in exchange for payment by the CI, so that the CI could obtain lawful immigration status.

## IX. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

55. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.     Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one

43
Instrumentality Protocol - Filter Team

device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive
could contain as many as approximately 450 full run movies or
450,000 songs.

       d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve

residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating

Instrumentality Protocol - Filter Team

systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

     f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

     g.    Finally, language issues can complicate a review of digital data, for instance when documents and data are in foreign languages, which will likely be the case here.

Instrumentality Protocol - Filter Team

56.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

47

Instrumentality Protocol - Filter Team

## X.  CONCLUSION

57.  Based upon the information set forth above and my
training and experience, I believe there is probable cause for
criminal complaints against, and the issuance of arrest warrants
for, JASON SHIAO, aka "Jason Zheng," aka "Zheng Yi Xiao," LYNN
LEUNG, aka "Linda," and SHANNON MENDOZA for violations of Title
18, United States Code, Section 371 (conspiracy to commit visa
fraud, in violation of Title 18, United States Code Section
1546(a)), Title 18, United States Code Section 2(b) (causing an
act to be done), and Title 8, United States Code, Section
1325(c) (marriage fraud).  I also believe there is probable
cause to search the SUBJECT PREMISES for violations of Title 8,
United States Code, Section 1325(c) (marriage fraud); Title 18,
United States Code, Section 1546(a) (fraud and misuse of visas,
permits, and other documents); and Title 18, United States Code,
Section 371 (conspiracy to commit offenses and to defraud the
United States).

_____/ S /_____
Daniel P. Carney
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on this ___ day of September 2015.

_____
HON. SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

48
Instrumentality Protocol - Filter Team

<u>ATTACHMENT A</u>

<u>PREMISES TO BE SEARCHED</u>

1.    The premises to be searched is Jason (USA)
International Law Corporation, also known as Zhengyi &
Associates, a business located at 80 South Lake Avenue, Suite
555, Pasadena, California 91101 ("SUBJECT PREMISES").  The
SUBJECT PREMISES is believed to be operated by Jason SHIAO and
his daughter, Lynn LEUNG.  The SUBJECT PREMISES is located in a
multiple-story, gray colored commercial building on the
southeast corner of the intersections of East Green Street and
South Lake Avenue in Pasadena, California.  There is a glass
door entrance to the building on the south side of Lake Avenue,
east of the entrance to a Wells Fargo Bank, which is also
located at 80 South Lake Avenue.  The SUBJECT PREMISES is
located within Suite 555, which is on the fifth floor.  Upon
exiting the elevator bank on the fifth floor, and facing east,
there is an east-west hallway ("East-West Hallway") where Suite
555 is located.  Suite 555 is the third door on the right when
heading east from the elevator.  A brown wooden door serves as
the entrance to Suite 555.  A golden metallic sign to the left
of the door reads "555" in black letters.  Underneath the sign
reading "555" is another sign which reads "Zhengyi &
Associates."  Across from the entrance to the SUBJECT PREMISES
is a doorway which leads to a stairwell.

Instrumentality Protocol - Filter Team

**ATTACHMENT B**

I. <u>ITEMS TO BE SEIZED</u>

1.     The items to be seized are evidence, fruits, and
instrumentalities of violations of Title 8, United States Code,
Section 1325(c) (Marriage Fraud); Title 18, United States Code,
Section 1546(a) (Visa Fraud), and Title 18, United States Code,
Section 371 (Conspiracy to Commit Offense or Defraud the United
States), namely, for the time period beginning October 1, 2006
through the present:

a.     Petition for Alien Relative ("I-130") petitions,
Application to Register Permanent Residence or Adjust Status
("I-485") applications, Petition to Remove the Conditions of
Residence ("I-751") petitions, Affidavit of Support ("I-864")
applications, Report of Medical Examination ("I-693")
applications, Biographic Information ("G-325") form, Change of
Address ("AR-11") form, Application for Naturalization ("Form
N-400"), and Petition for Alien Fiancé/Fiancée ("I-129F")
applications.

b.     Wedding photographs of married couples, wedding
albums, photographs of married couples in general settings,
marriage certificates, witness affidavits, and any of following
documents belonging to petitioners and/or beneficiaries in
fraudulent marriages:

i.     Utility bills, lease agreements, photocopied
passports, driver licenses, lawful permanent resident cards,
naturalization certificates, and any other picture
identification, photocopied checks, birth certificates, Wage and

1
Instrumentality Protocol - Filter Team

Tax statements ("W-2s"), income tax returns, insurance policies, Social Security cards, personal correspondence between petitioners and beneficiaries as well as to and from USCIS, and employment records.

c.    Notes, internal memoranda, appointment books and calendars, and address books.

d.    Rental records of properties and/or mailboxes rented by SHIAO and/or LEUNG.

e.    Bulk currency or other monetary instruments over $1,000 (in aggregate).

f.    Keys or access codes showing ownership or control over the SUBJECT PREMISES.

g.    Records showing ownership, dominion, or control over the SUBJECT PREMISES including utility statements and rental or lease agreements.

h.    Bank account records, wire transfer records, bank statements, safe deposit box keys and records, money containers, safes, financial records and notes showing payment, receipt, concealment, transfer or movement of cash or monetary instruments belonging to and/or prepared by SHIAO and/or LEUNG in the operation of their business.

i.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

j.    As used above above, the terms "records, documents, programs, applications, or materials" includes records, documents, programs, applications, or materials created, modified, or stored in any form.

2

Instrumentality Protocol - Filter Team

2.    With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    passwords, encryption keys, and other access devices that may be necessary to access the device;

g.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    h.    records of or information about Internet Protocol addresses used by the device;

    i.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

    4.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES (USE OF FILTER TEAM)

5. In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a. The physical search of the premises will be conducted by law enforcement agents who are investigating the subject offenses (the "investigative team"). Upon securing the premises, the investigative team will search for digital devices capable of being used to facilitate such offenses or capable of containing data falling within the scope of the items to be seized. In attempting to do so, the investigative team will not review data contained on any digital device. The investigative team may, however, consult (either on-site or off-site) with law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction who are not involved in the investigation of the subject offenses (the "filter team"), at least one of whom is specially trained in imaging, searching, seizing, and/or segregating digital data.

b. The filter team will, in its discretion, either search each digital device on-site or transport the device to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c. The filter team will complete its search of the digital device(s) as soon as is practicable but not to exceed 60 days from the date of execution of the warrant. If additional time is needed, the government may seek an extension of this

Instrumentality Protocol - Filter Team

time period from the Court on or before the date by which the search was to have been completed.

        d.   The filter team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

        i.   The filter team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of the items to be seized.  The filter team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.   The filter team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        e.   The filter team shall make and retain notes regarding its search of the digital device(s).

        f.   If the filter team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

Instrumentality Protocol - Filter Team

g.   The filter team will not disclose to the investigative team, or any Assistant United States Attorney involved in this investigation, any data contained on a digital device other than that which is seized as falling within the scope of the items to be seized under this warrant except with prior authorization from the Court.  The filter team may disclose to the investigative team any data contained on a digital device that is seized as being within the scope of the items to be seized under this warrant without further order of the Court.

h.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

i.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

j.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

k.   The filter team may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is

7

Instrumentality Protocol - Filter Team

latest), only if the device is determined to be an
instrumentality of an offense under investigation or the
government, within 14 days following the time period authorized
by the Court for completing the search, obtains an order from
the Court authorizing retention of the device (or while an
application for such an order is pending).  Otherwise, the
government must return the device.  Notwithstanding the above,
after the completion of the search of the digital devices, the
government shall not access digital data falling outside the
scope of the items to be seized absent further order of the
Court.

    6.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## III. TAINT PROCEDURES FOR POTENTIALLY PRIVILEGED MATERIALS

    7.   I am aware that information in the offices of an
attorney may be subject to the protections of the attorney-
client privilege and/or the work-product privilege.  Although
SHIAO is not, to the best of my knowledge, a licensed attorney
in California or anywhere else in the United States, I am aware
that because SHIAO repeatedly held himself out as an attorney to
potential clients, SHIAO's clients may have reasonably believed

that SHIAO was authorized to practice law.[2]  As a result, out of an abundance of caution, HSI and the United States Attorney's Office for the Central District of California will designate a filter team, to include one or more agents and Assistant United States Attorneys ("AUSAs"), respectively, to conduct a search of the SUBJECT PREMISES, review the records that are seized, and segregate any privileged materials (that do not fall within an exception to the privilege, i.e. the crime fraud exception) such that they are not produced to the investigative team and assigned AUSAs.

8.   The filter team will minimize the seizure of potentially privileged attorney-client communications by implementing the following procedures:

a.   The filter team will identify and segregate any legal files of SHIAO and those files will be screened by the filter team for scope and privilege issues before any review by the investigative team.

---

[2] In general, courts have held that the attorney-client privilege applies only if: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been claimed and (b) not waived by the client.  In re Grand Jury Subpoena, 341 F.3d 331, 335 (4th Cir. 2003); see also In re Grand Jury Testimony, 148 F.3d 1100, 1106 (D.C. Cir. 1998).  Since SHIAO is not "a member of the bar of a court," the privilege does not appear to apply.  Nonetheless, as indicated above, in an abundance of caution, the filter team protocol, as described herein, will be implemented.

b.   If the filter team determines that a seized document appears to contain potentially privileged communications, the filter team member will then review only as much of the document as necessary to determine whether or not the document is within the scope of the warrant.

c.   If the filter team determines that a document contains potentially privileged communications, but is not within the scope of the warrant, the document will be set aside and will not be subject to further review or seizure.

d.   If the filter team determines that a document found falls within the scope of the warrant and contains potentially privileged communications, the document will be segregated and provided to one or more AUSAs that are not a part of the government's investigation (the "filter team AUSAs").  No agents involved in the investigation will examine the contents of such documents unless and until directed to do so by the United States Attorney's Office or the Court.

e.   The members of the filter team and the filter team AUSAs will not discuss the contents of any privileged communications with any agents or prosecutors involved in the investigation.

f.   One of more of the filter team AUSAs will be available for telephonic consultation with members of the filter team during the search.

g.   The members of the filter team and the filter team AUSAs will not otherwise participate in the investigation/prosecution of this case.

10
Instrumentality Protocol - Filter Team

9.    The following procedures shall apply to any potentially privileged documents falling within the scope of the warrant that are provided to the filter team AUSAs:

a.    The filter team AUSA will review each document or file to determine whether it is (1) privileged; (2) non-privileged because the attorney-client privilege does not apply; or (3) non-privileged because its falls within an exception to the attorney-client privilege (i.e. the crime-fraud exception) or is subject to a valid privilege waiver.  If the materials are determined not to be privileged and within the scope of the warrant, the seized materials will be turned over to the agents and AUSAs prosecuting the case.  If the materials are determined to be privileged, the seized materials will not be shown to the agents and AUSAs prosecuting the case.  Instead, in this case, the seized materials will be returned to defense counsel (with sealed copies retained by the filter team AUSA or other members of the filter team);

b.    Materials that are arguably privileged or in dispute that appear to be within the scope of the warrant will be retained by the filter team AUSA and submitted to a United States Magistrate Judge or a United States District Court Judge for a ruling as to whether the privilege applies and/or whether the materials fall within any exception to the attorney-client privilege;

c.    The arguably privileged materials retained by the filter team AUSA will not be shown to the agents and Assistant United States Attorneys prosecuting the case unless and until a

11
Instrumentality Protocol - Filter Team

Judge determines that the materials are not privileged or fall within any exception to the attorney-client privilege;

10.  If a member of the investigative team or an AUSA working on the investigation later determines that a document it received from the filter team or filter team AUSAs nevertheless appears to contain potentially privileged communications, then the agent or AUSA will cease any further review of the document and immediately notify a member of the filter team and filter team AUSA to review the document further in accordance with the protocols set forth above.